**Wayne G. ROSE, et al., Plaintiffs,**

v.

**ARKANSAS VALLEY ENVIRONMEN-TAL & UTILITY AUTHORITY, et al., Defendants.**

**No. 81–0397–CV–W–0.**

United States District Court,
W.D. Missouri.

April 18, 1983.

Michael E. Waldeck, Niewald, Risjord & Waldeck, Kansas City, Mo., J. Michael Rediker, Ritchie & Rediker, Birmingham, Ala., for plaintiffs.

James Borthwick, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, Mo., Crawford S. McGivaren, Jr., and Larry B. Childs, Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., Lawrence Berkowitz, Stinson, Mag & Fizzell, F. Philip Kirwan, Margolin & Kirwan, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION AND ORDERS

ROSS T. ROBERTS, District Judge.

This is an action in which nine plaintiffs, as holders of certain revenue bonds issued by defendant Arkansas Valley Environmental & Utility Authority ("the Authority"), seek damages and other relief in connection with an alleged securities fraud relating to those bonds. Named as defendants together with the Authority are three business corporations, Milanson Development Co., Stone Enterprises, Inc., and C.M. Stone & Co.; a bank, Plaza Bank & Trust Company ("Plaza Bank"); and three individuals, Fred W. Rausch, an attorney, Julian M. Riley, an attorney, and one Roy G. Miller. The complaint is in seven counts, the first asserting claims under sections 10(b) and 20 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t, and under Rule 10b–5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b–5. The remaining six counts allege state law claims for violations of the Uniform Securities Act as adopted in Missouri, Chapter 409 R.S.Mo. 1969 (as amended) (Second Claim), for common law fraud and deceit (Third Claim), for negligence (Fourth Claim), for punitive damages (Fifth and Sixth Claims), and for breach of trust (Seventh Claim).

The matter comes before me on separate motions to dismiss filed by defendants Rausch and Plaza Bank. Plaza Bank asserts thereby that plaintiffs' claims are time barred. Rausch joins in that suggestion, and additionally urges that plaintiffs Allgood, McFeely and Kessler lack standing to assert 10(b) and 10b–5 claims, that venue is improper with respect to plaintiffs' 10(b)

and 10b–5 claims, that personal jurisdiction over him with regard to the state law claims is lacking, and that the complaint fails to state a claim as against him. None of the other defendants has filed a responsive pleading of any kind.

Neither defendant's motion is styled as one for summary judgment, but both moving defendants and plaintiffs have submitted affidavits and other evidentiary materials in support of their respective positions.[1] Those materials relate to the statute of limitations question, the venue question, and the question of personal jurisdiction over defendant Rausch. Since I have not excluded the materials, the issues to which they relate will be treated under the summary judgment procedure provided for in Rule 56.[2] See Fed.R.Civ.P. 12(b). The remaining issues raised by the motions will be dealt with directly under Rule 12(b).

## I

### BACKGROUND

In the spring of 1974, defendant Authority, an Oklahoma trust with its principal place of business in the State of Oklahoma, issued certain revenue bonds in the total principal amount of $840,000, to finance the construction of streets, curbs and gutters in a private real estate development in or near the community of Prue, Oklahoma. Those bonds are hereinafter referred to as the "Series A 1973" bonds. Plaintiffs (or in three instances, their respective predecessors in title) are purchasers of certain of the Series A 1973 bonds.

According to the averments of the complaint, paraphrased and synthesized for present purposes, with a liberal reading in plaintiffs' favor, the bonds in question were essentially worthless from the outset. In general, it is alleged that defendants assisted one another in the perpetration of a

fraud in connection with that fact by causing the bonds to be issued and marketed, and by failing to disclose on the face of the bonds or otherwise in connection with their issuance and sale a number of matters which, if truly stated or revealed, would have disclosed to the buying public the inherently valueless nature of the instruments. Asserted as being among such matters was the fact that the bonds were (contrary to the pronouncement on the face of each bond) either totally unsecured or at least undersecured or improperly secured; the fact that the bonds had been issued without any closing procedure; the fact that the underwriting discounts, commissions and various fees connected with issuance amounted to over 30% of the total bond proceeds; the fact that the underlying project for which the bonds were issued was undercapitalized and would have been so even if all of the bond proceeds had been paid over to defendant Authority; the fact that no effort had been made to determine whether the revenues generated by the project would be sufficient to pay the interest on the bonds, and that in fact a realistic appraisal of the project would have demonstrated the negative of that proposition; the fact that the project developers were inexperienced in such projects; and the fact that, because of improper use of the bond proceeds, difficulties might exist with respect to federal income tax exemption for the bond interest. As to the roles of the alleged participants, plaintiffs assert that defendant Miller was a controlling person of the defendant Authority itself, as well as of defendant Milanson Development Co., the proposed lessee of the project property, and defendant C.M. Stone & Co., which apparently acted as the underwriter of the bond issue; that defendant Riley acted as a promoter of the project together with Miller; that defendant Rausch acted as bond counsel; and that defendant Plaza

---

1. The submitted materials consist of the depositions of Robert Coatsworth (a former officer of defendant Plaza Bank) and defendant Rausch, together with a substantial amount of documentary material identified and used in connection with those depositions; an affidavit from defendant Rausch; and various pleadings, orders and docket sheets from the proceedings

in *Shores v. Arkansas Valley Environmental & Utility Authority,* # CA77 G06045 in the United States District Court for the Northern District of Alabama, accompanied by affidavits authenticating the same.

2. The parties have been notified accordingly.

Bank acted as trustee and paying agent for the issue.

Precisely when the present plaintiffs or their predecessors acquired their bonds and when or in what manner difficulties first became apparent is unclear from the materials presently before me, although it is clear that a default in the payment of interest on the bonds occurred in June or July of 1975. In any event, our scene now shifts to the United States District Court for the Northern District of Alabama, where on May 2, 1977, one Clarence Bishop, as a purchaser and holder of certain bonds issued by the Authority a year prior to the Series A 1973 bonds (such earlier bonds being referred to hereinafter as "Series A 1972" bonds), and as the sole named plaintiff, instituted a class action proceeding alleging securities fraud claims in respect of *both* the Series A 1972 and Series A 1973 issues. Named as defendants therein were some 16 persons, corporations and business entities, including six of the defendants named in the present case.[3] The complaint, except for its class action allegations and the fact that it dealt with both the Series A 1972 and Series A 1973 issues, was substantially similar to the complaint presently before me. The class for which certification was requested was described as being "composed of all persons who purchased the Series A, 1972 and 1973 Bonds," except for certain excluded groups consisting of underwriters, dealers and like persons.

From the information presently available it appears that the Bishop suit[4] remained in its original posture (and without any class action certification) until October 31, 1979, when four of the present plaintiffs moved to intervene in the proceedings.[5] That motion was granted on February 27, 1980. The class action aspect of the matter was resolved on March 28, 1980, with the District Court's certification of a Rule 23(b)

class consisting (as presently material) of "all persons who now hold or who do not hold but purchased...Series A 1972 and Series A 1973 (Bonds)...." In that ruling, in response to defendants' argument that plaintiff Bishop lacked "standing," under the Supreme Court's holding in *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), to assert any claim on behalf of the purchasers of Series A 1973 bonds, the court concluded that since intervening parties who had purchased Series A 1973 bonds were before it, and since the two bonds issues seemed intertwined in several respects, the appropriate procedure was to divide the general class into two subclasses consisting, respectively, of those who had purchased or who held Series A 1972 bonds, and those who had purchased or who held Series A 1973 bonds. *Shores v. Arkansas Valley Environmental & Utility Authority,* Fed.Sec.L.Rep. (CCH) ¶ 97,345 (March 28, 1980). An order approving the form of class action notice, and directing its issuance, was entered on September 22, 1980.

On February 4, 1981, however, the District Court reversed its position with respect to the "standing" issue presented by the joinder of claims on both series of bonds. The court apparently concluded, upon further reflection, that since Mr. Bishop himself had purchased only Series A 1972 bonds, and since the two bond issues were in fact separate, Mr. Bishop as the sole named original plaintiff lacked standing, under the *Blue Chip* rule, to maintain an action into which purchasers or holders of Series A 1973 bonds might properly have intervened. The court accordingly dismissed all claims relating to the Series A 1973 bonds, granted Plaza Bank's motion to dismiss it from the case (since it had acted only with respect to the Series A 1973

---

**3.** Arkansas Valley Environmental & Utility Authority, Fred W. Rausch, Jr., Roy Miller, Plaza Bank & Trust Company, C.M. Stone & Co., and Julian Riley (subsequently added).

**4.** Mr. Bishop died during the pendency of the action and his executor, James L. Shores, was substituted as party plaintiff. The suit is ac-

cordingly reported as *"Shores v. Arkansas Valley Environmental & Utility Authority, et al.,"* but for the sake of convenience I will continue to refer to the matter as "the Bishop suit."

**5.** F. Roger Page, Harvey A. Scott, Patricia B. English, and Orville Moses.

bonds) and, in effect, decertified the class with respect to purchasers or holders of Series A 1973 bonds. Official notice of this action, together with the court's certification of the ruling as final for purposes of appeal, was given on March 17, 1981.

The time for appeal of the Alabama District Court's order expired on April 16, 1981, with no appeal having been taken. The present plaintiffs (except Greenlee), as purchasers or holders of Series A 1973 bonds, thereupon instituted the instant proceeding by filing their complaint in this Court on May 19, 1981. Plaintiff Greenlee was added by an amendment filed June 4, 1981.

## II

### STANDING OF PLAINTIFFS

### ALLGOOD, McFEELY AND KESSLER

■ According to the allegations of the complaint, plaintiffs McFeely and Kessler acquired their Series A 1973 bonds by way of inheritance from their mother. Plaintiff Allgood sues as the trustee of a decedent's trust which holds Series A 1973 bonds purchased by the decedent.[6] Defendant Rausch suggests, under the holding in *Blue Chip Stamps v. Manor Drug Stores, supra,* that all three of these plaintiffs lack standing to assert 10(b) and 10b–5 claims. I agree.

*Blue Chip* represents the Supreme Court's affirmation and adoption of the so-called "Birnbaum rule," first articulated by the Second Circuit in *Birnbaum v. Newport*

6. Plaintiffs' Complaint, paragraphs 4E. (Allgood), 4H. (McFeely), and 4I. (Kessler).

7. Rule 10b–5 reads as follows:
 "It shall be unlawful for any person, directly or indirectly, by the use of any means of instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 (a) To employ any device, scheme, or artifice to defraud,
 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

*Steel Corp.,* 193 F.2d 461 (2d Cir.1952). In *Birnbaum,* Rule 10b–5[7] (which is the critical source for present purposes, since section 10(b) does not itself make any conduct unlawful) was interpreted as having application only to frauds committed upon actual purchasers or sellers of a security. This result was found to be compelled both by the language of the Rule (making it unlawful to do certain things "in connection with the purchase or sale of any security") and by the historical reasons for its adoption (simply to extend to defrauded *sellers* the same sort of protection which section 17(a) of the 1933 Securities Act had previously accorded only to defrauded *purchasers*). The majority opinion in *Blue Chip* validated this analysis, added the Supreme Court's own explanation of the policy considerations supporting the rule, and made quite clear that the words "purchaser" and "seller" are to be construed and applied literally.

■ Since plaintiffs Allgood, McFeely and Kessler are, by their own assertions, at best donees or legatees with respect to the Series A 1973 bonds they hold, and thus clearly neither "sellers" nor "purchasers" of those bonds, perhaps nothing more needs to be said. Compare *Kerrigan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 450 F.Supp. 639, 646–47 (S.D.N.Y.1978) (widow of purchaser lacks standing to assert 10b–5 claim); and *Lincoln Nat. Bank v. Lampe,* 414 F.Supp. 1270, 1280–81 (N.D.Ill.1976) (trust beneficiary lacks standing to assert 10b–5 claim).[8] I think it worthwhile, how-

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

8. I am aware that, in certain instances, the transfer of a security without consideration might be actionable under 10b–5, where the transferor is defrauded into making the transfer and where it is the transferor who seeks redress. See *International Controls Corp. v. Vesco,* 490 F.2d 1334, 1343–49 (2d Cir.1974); 5 Jacobs, *Litigation and Practice Under Rule 10b–5* § 9 (1981). I am unaware, however, of any case which would support the proposition that one who *receives* a security, but who parts with no consideration and incurs no liabilities

ever, to carry the analysis one step further, by noting that the fundamental premise underlying both *Birnbaum* and *Blue Chip* is that Rule 10b–5 can apply, in any event, only to persons who have been defrauded by the securities violation in question; that is, to persons who are caused by the violation to act or refrain from acting in respect of a security, or upon whom the violation otherwise works a fraud. As the majority opinion in *Blue Chip* makes clear, the Birnbaum rule's focus upon a literally applied requirement of "purchaser" or "seller" status is simply a method—admittedly arbitrary—of *further* limiting the class of persons who might otherwise be considered as having been defrauded in the broad sense mentioned above.[9] In the present case, however, it is rather obvious that plaintiffs Allgood, McFeely and Kessler have not personally been defrauded in any way at all, even in the most general sense. Their respective predecessors may have been, but as defendant Rausch correctly points out, any cause of action which might thereby have been created was personal to those predecessors; it did not inure in or automatically follow the security itself. *Independent Investor Protective League v. Saunders,* 64 F.R.D. 564, 575 (E.D.Pa.1974); *International Ladies Garment Wkrs. U. v. Shields & Co.,* 209 F.Supp. 145, 149 (S.D.N.Y.1962).

■ Plaintiffs suggest that a 10(b) and 10b–5 cause of action is both "survivable"— that is, it survives the death or corporate demise of the person or corporation in whom it originally existed—and assignable. Even if both such points are granted, however, they do not materially assist plaintiffs, given the presently pleaded posture of this case. A cause of action which survived the death of an original bond purchaser would survive as an asset of his or her estate, 1 Am.Jur.2d *Abatement, Survival and Revival,* § 107 (1962); 1 C.J.S. *Abatement and Revival,* § 162 (1936),[10] and some further act—unpleaded here—would be necessary to vest it in someone other than the personal representative of that estate. Again, the cause of action itself is entirely separate and distinct from the security which gave rise to it, and does *not* automatically follow the ownership of that security. *Independent Investor Protective League v. Saunders, supra; International Ladies' Garment Wkrs. U. v. Shields & Co., supra.* Plaintiffs here have pleaded nothing whatsoever to suggest that they have ever been assigned their predecessors' causes of action regarding those bonds, or have otherwise acceded to ownership thereof. In fact, the complaint rather plainly suggests they are attempting to assert their *own* 10(b) and 10b–5 causes of action, based simply upon their ownership or holding of the bonds. For the reasons stated previously they lack standing to assert such claims—against Rausch, or indeed against *any* defendant.[11]

A similar result, I feel, should obtain as regards the state law claims asserted by these three plaintiffs. Since any cause of action which might have accrued to a plaintiff's predecessor upon that predecessor's purchase of the bonds would have survived to his or her estate and personal representative, if it survived at all, and since these plaintiffs were simply *given* the bonds they hold, *after* the occurrence of any of the

in connection therewith, can be considered a "purchaser" of the security or otherwise entitled to maintain a 10b–5 cause of action in connection with its earlier sale to his or her donor.

9. For example, the plaintiffs in *Blue Chip,* who were held to lack standing, were stock offerees who asserted that misleading representations had induced them *not* to purchase the stock.

10. The rule in this respect would perhaps be controlled by the law of the predecessor's domicile at the time of his or her death. I am unadvised, however, with respect to the domicile of any of these predecessors at the time of his or her death. The rule in Missouri, at least, is in accord with the general rule. See § 537.-010, R.S.Mo. 1969 (as amended).

11. While only Rausch has moved for dismissal on this basis, it is clear that the same ruling would inevitably apply to each of the defendants. In these circumstances a court is empowered to act, *sua sponte,* to grant dismissal as to *all* defendants. *Silverton v. Department of Treasury, Etc.,* 644 F.2d 1341, 1345 (9th Cir.1981), *cert. den.,* 454 U.S. 895, 102 S.Ct. 393, 70 L.Ed.2d 210 (1982).

alleged acts of fraud, negligence or other breach of duty,[12] it is difficult to understand how they might have a cause of action *of any kind* of their own to assert, deriving simply from ownership of the bonds. Thus, for example, as to a claim under the Missouri Securities Act (Second Claim), or for common law fraud and deceit (Third Claim), it would seem rather clear that, as mere recipients of *gifts* of the bonds in question, plaintiffs can hardly be said to have acted in reliance upon any misrepresentation or omission by the defendants, or directly to have suffered damage thereby. A similar point may be made with respect to a negligence or other breach of duty claim against any of the defendants since, again, it is difficult to conceive how the *donee* of a bond, valueless at the time he receives it, may himself be said to have been legally damaged by the earlier conduct which rendered that bond valueless. To sanction such a theory would be to create a new and separate cause of action each time a worthless bond is given by one person to another—a result that common sense does not commend. I do not gainsay the idea that one who subsequently *purchased* a bond from an earlier holder might, in certain circumstances, be able to maintain an action against defendants such as these, based upon his or her own purchase and consequent injury, but that is not the situation with the present three plaintiffs.

I conclude, accordingly, that *all* of the claims presently asserted by Allgood, McFeely and Kessler—both federal and state—are subject to dismissal. There is at least a possibility, however, that a factual background may exist which, if properly pleaded, would demonstrate that these plaintiffs are in a position to assert survived claims of their predecessors. I will, therefore, grant leave for the filing of an amended complaint by them within thirty (30) days from the date of this opinion. Further, since not even Rausch has moved to dismiss plaintiffs' state law claims on this basis,[13] and since the court's dismissal of those claims *sua sponte* and without notice is a radical step, not to be taken lightly in such circumstances, *Barnes v. Dorsey,* 354 F.Supp. 179, 184 (E.D.Mo.1973), aff'd. 480 F.2d 1057 (8th Cir.1973), I will, as an alternative to the right to replead granted above, allow plaintiffs Allgood, McFeely and Kessler a period of thirty days from the date of this Order within which to show cause why their state law claims, in their presently pleaded form, should not be dismissed. See *Wong v. Bell,* 642 F.2d 359, 361–62 (9th Cir.1981).

## III

### STATUTES OF LIMITATIONS

#### A. 10(b) and 10b–5

Defendants Rausch and Plaza Bank urge that plaintiffs' complaint, taken together with the various documentary materials filed in connection with the present motion, demonstrates that plaintiffs' 10(b) and 10b–5 claims are time barred. Essentially, defendants suggest that the relevant limitations period is two years; that plaintiffs are shown to have had either actual or constructive knowledge of the fraud of which they complain more than two years prior to the filing of this suit; and that the class action tolling doctrine announced in *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), is inapplicable.

 As defendants correctly note, Congress has not provided a statute of limitations for private civil actions brought under section 10(b) and Rule 10b–5. Accordingly,

**12.** Plaintiffs' complaint specifically alleges that plaintiffs McFeely and Kessler inherited their bonds from their mother, who died in 1978, after the Bishop suit had been filed. The complaint is silent as to the date of death of Allgood's predecessor, Mr. John D. Pendleton, but by the same token contains no averments which suggest that any defendant's act inflicted injury personal to Allgood (as trustee) as opposed to Mr. Pendleton.

**13.** The subject might well be reached through Rausch's general motion to dismiss for failure to state a claim; but since none of the parties have directed any of their briefing efforts to the specific subject, I feel it more appropriate to follow the procedure outlined above.

as in other cases involving federal judicially created remedies, the law of the forum state must be consulted, and the state limitations period governing the mostly closely analogous state created cause of action must be applied. See generally *Holmberg v. Armbrecht,* 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946); *United Automobile Workers v. Hoosier Cardinal Corp.,* 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (footnote 29); *Morris v. Stifel, Nicholaus & Co.,* 600 F.2d 139 (8th Cir.1979). Here, of course, the forum state is Missouri, and the Eighth Circuit's decision in *Morris v. Stifel, Nicholaus & Co., supra,* requiring that section 409.411(e), R.S.Mo.1969 (as amended) (the limitations section of the Missouri Uniform Securities Act), be applied to claims of the present nature, is directly controlling. The relevant limitations period insofar as plaintiffs' 10(b) and 10b–5 claims are concerned is thus the two year period established by that statute. *Cf. Buder v. Merrill Lynch, Pierce, Fenner & Smith,* 644 F.2d 690, 692 (8th Cir.1981).

 The applicable limitations period being thus ascertained, the next inquiry involves a determination as to when that period began to run. Section 409.411(e) itself provides that its two year period shall commence as of the date of the "contract of sale" of the security. The decision in *Morris,* however, makes clear that insofar as federal 10(b) and 10b–5 claims are concerned, federal common law principles will be applied to determine the point of commencement of a limitations period, even though the state statute being utilized to determine the *length* of the period contains different provisions. *Morris v. Stifel, Nicholaus & Co., supra* at 140; *Buder v. Merrill Lynch, Pierce, Fenner & Smith, supra.* Those federal common law principles establish that in cases involving elements of fraud, a statute of limitations will not begin to run until the fraud "is or should have been discovered." *Vanderboom v. Sexton,* 422 F.2d 1233, 1240–41 (8th Cir.1970). Thus, the two year limitations period applicable to plaintiffs' 10(b) and 10b–5 claims

here must be measured from the date upon which it may be said that plaintiffs first discovered or, in the exercise of due diligence and upon reasonable inquiry, could have discovered the fraud of which they now complain. *Morris v. Stifel, Nicholaus & Co., supra; Buder v. Merrill Lynch, Pierce, Fenner & Smith, supra.*

Having outlined the general framework within which the instant question must be decided, I feel it may facilitate analysis to turn now to a determination of whether the class action tolling doctrine announced in *American Pipe & Construction Co. v. Utah, supra,* is applicable in this case. If it is not, then for reasons which will subsequently appear plaintiffs' 10(b) and 10b–5 claims are rather clearly time barred under any view of the facts before me. If, on the other hand, the doctrine is applicable, at least a rather crisply defined question can be posed with respect to the timeliness of plaintiffs' claims.

The class action tolling rule was originally articulated by Mr. Justice Stewart, in *American Pipe,* in the following language:

"We hold that in this posture, at least where class action status has been denied solely because of failure to demonstrate that 'the class is so numerous that joinder of all members is impracticable,' the commencement of the original class suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status."

414 U.S. at 553, 94 S.Ct. at 766. As might be anticipated from this quotation of the rule, the precise questions for my determination are (a), whether the rule may be applied in cases where class action status is denied or terminated for some reason other than a lack of "numerosity," and more specifically, whether it can be applied where denial or termination is premised upon the named plaintiff's lack of "standing" to maintain the class claims, and (b), whether the rule may be applied in situations where, after class action status has been denied or

terminated, a former class member initiates a new and separate action rather than seeking to intervene in the original suit.

As to the first such question, I note that a number of lower federal courts have, since the decision in *American Pipe,* applied its rule in a variety of situations where class action status was denied or terminated for reasons other than lack of "numerosity." See *Parker v. Crown, Cork And Seal Co., Inc.,* 677 F.2d 391, 393 n. 2 (4th Cir.1982) (lack of "numerosity" as to one claim; named plaintiff not representative of the class as to another claim), *cert. granted,* —— U.S. ——, 103 S.Ct. 338, 74 L.Ed.2d 381 (1982); *Satterwhite v. City of Greenville,* 578 F.2d 987, 991, 997 (5th Cir.1978) (lack of "commonality" and "typicality;" class representative not member of class) *(dicta), vacated on other grounds,* 445 U.S. 940, 100 S.Ct. 1334, 63 L.Ed.2d 773 (1980); *McCarthy v. Kleindienst,* 562 F.2d 1269, 1272–74 (D.C.App.1977) (lack of "typicality," untimeliness and failure to meet 23(b)(3) requirements); *Peritz v. Liberty Loan Corp.,* 523 F.2d 349, 354 n. 5 (7th Cir.1975) (untimely certification); *Green v. U.S. Steel Corp.,* 481 F.Supp. 295, 299–301 (E.D.Pa.1979) (lack of "typicality" and "commonality"); *Johnson v. Brace,* 472 F.Supp. 1056, 1059 (E.D.Ark.1979) (failure to meet 23(b)(2) requirements); *Gramby v. Westinghouse Elec. Corp.,* 84 F.R.D. 655, 662 (E.D.Pa.1979) (lack of adequate representation); *Bantolina v. Aloha Motors, Inc.,* 75 F.R.D. 26, 32–3 (D.Haw.1977) (withdrawal of class representative); *Morton v. Charles County Board of Education,* 373 F.Supp. 394, 395–96 (D.Md.1974) (lack of "typicality"), *aff'd.* 520 F.2d 871 (4th Cir. 1975), *cert. den.* 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1976); *Goldstein v. Regal Crest, Inc.,* 62 F.R.D. 571, 579–80 (E.D.Pa. 1974) (lack of "commonality"). And it has been applied in at least one case where lack of "standing" was directly involved. See *Haas v. Pittsburg National Bank,* 526 F.2d 1083, 1095–98 (3d Cir.1975). In short, the *American Pipe* rule has in fact been applied in cases involving almost every conceivable basis upon which class action status might be denied or terminated. These courts have found no reason to limit application of the rule to instances where denial or termination is based on lack of "numerosity;" and as a general matter, given the rationale expressed in *American Pipe,* neither do I.

That rationale was based upon two essential points: (a) that a contrary rule would inevitably force "passive" (*i.e.,* unnamed) class members to file motions to intervene, in order to protect themselves against the running of a limitations period if class action status was later denied or terminated—a situation which "would deprive Rule 23 class actions of the efficiency and economy of litigation which is the principal purpose of the procedure," 414 U.S. at 553, 94 S.Ct. at 766; and (b), that the basic policy considerations behind a statute of limitations—"to promote justice by preventing surprises through revival of claims that have been allowed to slumber until evidence has been lost, memories have faded and witnesses have disappeared," 414 U.S. at 554, 94 S.Ct. at 766,—would be satisfied since the filing of a class action within the limitations period would serve to advise a defendant not only of the substantive claims which must be defended, but also of the number and at least generic identity of the persons who have such claims. So long as those two points of rationale are accommodated by the matter at hand—and as the cases indicate, they may be satisfied in a rather wide variety of situations—I perceive no sound reason for any limitation based upon technical distinctions concerned with *why* class action was eventually denied or terminated. I would agree, instead, with the suggestion that the appropriate focus of inquiry here should simply be upon the extent to which the claims asserted in the earlier class proceeding have in fact placed a defendant upon notice of the claims presently at issue. See Comment, *The American Pipe Dream: Class Actions and Statutes of Limitations,* 67 Iowa L.Rev. 743 (1982).

It is with these thoughts in mind that I examine defendant Rausch's suggestion that *American Pipe* cannot be applied in a case such as the present one, where the class in question was decertified upon a

determination that the class representative lacked "standing" to assert a claim on behalf of the class. In support of that position, Rausch argues that a suit instituted by one who lacks standing is a nullity from the outset—a "nonexistent lawsuit"—citing _McClune v. Shamah,_ 593 F.2d 482 (3d Cir. 1979), and _Hobbs v. Police Jury of Moorehouse Parish,_ 49 F.R.D. 176 (W.D.La.1970), and accordingly that a class action commenced by one who lacks standing cannot logically function to toll a statute of limitations. I note that both such cases were concerned with intervention situations [14] and held, as have other decisions, that a suit instituted by one who lacks standing cannot be saved by the intervention of a party who has standing, the theory being that intervention is an ancillary proceeding which requires the existence of a properly instituted main suit. But however that may be, it can hardly be said that a suit commenced by one who lacks standing is in any literal sense a "nonexistent" suit. It may be a defective suit, subject to a motion to dismiss or perhaps even to the court's dismissal _sua sponte,_ but it is for all that no less the judicial assertion of a claim, functioning to give a defendant notice of whatever causes of action are asserted therein. And where such a claim is asserted by way of a class action, and in fact covers the causes of action which a class member himself could properly bring, a defendant has received just as much notice as might have been imparted if the proceeding had been instituted by that class member. In fact, if one were to deal only in generalities, a class action which is denied or terminated because the class representative lacks "standing" might often be more likely to give a defendant actual notice of the claims of individual class members than one where denial or termination was based upon a lack of "typicality" or "commonality."

Nor, in my view, is there anything singular or peculiar with respect to "standing" that would generally prevent application of the other consideration expressed in _American Pipe_—the concern that where the determination to disallow the class action is made upon "subtle factors," a rule "requiring successful anticipation of the determination of the viability of the class would breed needless duplication of motions [to intervene]." Standing questions are ones with which both skilled counsel and skilled courts sometimes experience considerable difficulty, even after extensive discovery and when intimately acquainted with the facts, as vividly demonstrated by the history of the present litigation itself. I can see no more reason, as a general matter, to require a passive class member to anticipate the existence of and ultimate ruling upon that question than to require him to do so with respect to questions of "numerosity," "commonality" or "typicality."

■ I conclude, accordingly, that the fact that a class action is disallowed because the class representative lacks "standing" does not, _per se,_ prevent application of the _American Pipe_ tolling rule. _Haas v. Pittsburg National Bank, supra._ Instead, I suggest again that the appropriate focus of inquiry should be upon the extent and character of the notice of the later individual claims which the defendant actually received from the class action.

In applying that method of analysis to the 10(b) and 10b–5 claims in this case, I

---

**14.** _Hobbs_ in fact also dealt with a statute of limitations problem, holding that where a class action had been commenced by one who lacked standing the suit could not be saved, after the statute of limitations had run, by permitting a proper party plaintiff to intervene and be substituted. The court specifically pointed out, however, that such a result was compelled by the peculiar nature of the Louisiana statute under consideration, which established a _peremptive_ limitations period (which operates to extinguish completely the cause of action involved, and cannot be interrupted in any fashion) rather than a _prescriptive_ limitations period (which simply operates to bar the remedy and can be interrupted). The court observed that it might have been inclined to reach a different result if the latter sort of statute had been involved. So far as I am aware, the limitations period involved in the instant case must be considered "prescriptive" rather than "peremptive." In that connection, I might further point out that _Hobbs_ dealt with the application of a Louisiana statute of limitations to a Louisiana cause of action, rather than the mere adoption of a state limitations _period_ to a federal cause of action.

note that the relevant portions of plaintiffs' present complaint are for the most part nearly identical to—and in many instances a verbatim copy of—the corresponding allegations in the second amended complaint filed in the Alabama proceedings. Since that is so, and since by virtue of those proceedings defendants were made aware (actually in some instances and at least constructively in all) of the identities of the present claimants, it would seem clear that the prior Alabama class action has in fact functioned to alert defendants to the claims being asserted against them here. Indeed, defendants have apparently had the benefit of a considerable amount of discovery in the Alabama proceedings with regard to those claims. In these circumstances, I find nothing in the fact that class certification was terminated because of a lack of standing of the class representative which would prevent an application of the *American Pipe* rule in the present case.

The second basic question posed above—whether *American Pipe* can be applied to a *separate suit* filed after denial or termination of the class action—is more troublesome. Inquiry into the question discloses a somewhat enigmatic footnote in one subsequent Supreme Court decision, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176 n. 13, 94 S.Ct. 2140, 2152 n. 13, 40 L.Ed.2d 732 (1974),[15] an equally enigmatic comment in a dissenting opinion by Mr. Justice Powell in another Supreme Court case, *United Airlines, Inc. v. McDonald,* 432 U.S. 385, 402, 97 S.Ct. 2464, 2474, 53 L.Ed.2d 423 (1977),[16] and a further comment by Mr. Justice Marshall in a concurring/dissenting opinion in yet another Supreme Court decision, *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 474–75, 95 S.Ct. 1716, 1727–28, 44 L.Ed.2d 295 (1975);[17] a split of authority among the Courts of Appeal, with the Second Circuit,[18] the Ninth Circuit[19] and the District of Columbia Circuit[20] holding that *American Pipe* does not apply to a separate suit situation, while the Fourth Circuit[21] and Seventh Circuit[22] have held that it does, with dicta from the Fifth Cir-

**15.** The body of the opinion, 417 U.S. at 176, 94 S.Ct. at 2152, contains this language:

"Accordingly, each class member who can be identified through reasonable effort must be notified that he may request exclusion from the action *and thereby preserve his opportunity to press his claim separately* or that he may remain in the class and perhaps participate in the management of the action" (emphasis added).

The footnote in question was appended to the following sentence, and states:

"13. Petitioner also argues that class members will not opt out because the statute of limitations has long since run out on the claims of all class members other than petitioner. This contention is disposed of by our recent decision in American Pipe & Construction Co. v. Utah, ..., which established that commencement of a class action tolls the applicable statute of limitations as to all members of that class."

**16.** "In my view, the proper analysis of these questions is as follows: Under American Pipe, the filing of a class action complaint tolls the statute of limitations until the District Court makes a decision regarding class status. If class status is denied in whole or in part, the statute of limitations begins to run again as to class members excluded from the class. In order to protect their rights, such individuals must seek leave to intervene in the individual action (*or possibly file an action of their own*) before the time remaining in the limitations period expires" (emphasis added).

**17.** "In *American Pipe* we held that the initiation of a timely class action tolled the running of the limitation period as to individual members of the class, *enabling them to institute separate actions after the District Court found class action an inappropriate mechanism for the litigation*" (emphasis added).

**18.** *Stull v. Bayard,* 561 F.2d 429, 433 (2d Cir. 1977), *cert. den.* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 783 (1978); *Arneil v. Ramsey,* 550 F.2d 774, 783 (2d Cir.1977).

**19.** *Pavlak v. Church,* 681 F.2d 617, 620–21 (9th Cir.1982), *cert. granted,* — U.S. —, 103 S.Ct. 3529, 77 L.Ed.2d — (1982).

**20.** *Wachovia Bank & Trust Co. v. National Student Mkg. Group,* 650 F.2d 342, 346 n. 7 (D.C. Cir.1980), *cert. den.* 452 U.S. 954, 101 S.Ct. 3098, 69 L.Ed.2d 965 (1981).

**21.** *Parker v. Crown, Cork & Seal Co., supra.*

**22.** *Peritz v. Liberty Loan Corp., supra.*

cuit[23] in accord; and with several District Court opinions on both sides of the question.[24] The Eighth Circuit, so far as I can determine, has not yet addressed the problem.

The difficulty arises in large part because of the presence of considerations not directly dealt with in *American Pipe.* The Court's analysis there handles rather nicely the intervention/lack of "numerosity" situation with which the Court was faced: intervention in the original suit prevents a proliferation of litigation, and a lack of "numerosity" basis for disallowance of the class action almost by definition suggests that re-entry of the former class members, by way of intervention, will not create an unmanageable single piece of litigation. In other situations, however, the appropriate answer does not come so readily.

Allowing tolling for separate suits after class action status is denied or terminated obviously has the potential of increasing the number of suits a defendant must defend, and may increase the general burden on the courts as well, and to that extent might be thought to cut across the grain of one of the implicit theories involved in *American Pipe;* but there are counterbalancing considerations. Where disallowance of the class is based upon reasons other than lack of numerosity—particularly where the problem is one of "typicality" or "commonality"—intervention of former class members back into the original suit may create an unmanageable piece of litigation which can be adequately handled, if at all, only by severance of claims and separate trials—a situation which to a considerable extent brings one back full circle to a situation of separate suits. Furthermore, intervention in these situations will often be permissive only,[25] and it hardly seems sensible that a former class member's claims should be saved if the court permits intervention but

held time-barred if the court does not, or that passive class members should be required to forecast, at the outset, the outcome of this additional question. Arguably, of course, in some instances these concerns could be addressed by requiring that an effort first be made to intervene, with tolling to apply to separate suits only if intervention is not allowed, but in other situations the expected ruling may be so easily forecast as to make this a needless waste of time. Thus in the present matter, if the Alabama District Court remained faithful to the apparent predicate for its decertification ruling, it is difficult to conceive the basis upon which the court might have permitted a re-intervention by these plaintiffs. And there may be yet other potential problems. In the present case, for example, the court's action in decertifying the sub-class consisting of Series A 1973 bond purchasers was coupled with a dismissal of all claims against defendant Plaza Bank, since it had no connection with the Series A 1972 bonds. It is obvious, however, that Plaza Bank is considered a "target" defendant insofar as the Series A 1973 plaintiffs are concerned, in the sense that it is apparently one of the few solvent prospective defendants left available for them to pursue. Whether their claims against the bank can be substantiated is, of course, quite another matter; but a rule which required them to intervene in the Alabama proceedings (even assuming that they could) and to forego those claims, or in the alternative to find all of their claims time barred, does not seem appropriate to me.

In resolving these issues as far as the present case is concerned, it may not be necessary to go so far as to posit a general extension of the *American Pipe* tolling doctrine to *all* separate suit situations. There are, as just pointed out, certain features peculiar to the present litigation which

23. *Satterwhite v. City of Greenville, Texas, supra.*

24. *Gluck v. Amicor, Inc.,* 487 F.Supp. 608, 614–15 (S.D.N.Y.1980) (*cannot* be applied to separate suit); *Jefferson v. H.K. Porter Co.,* 485 F.Supp. 356, 360–61 (N.D.Ala.1980) (*cannot* be

applied to separate suit); *Green v. United States Steel Corp., supra* (*can* be applied to separate suit); *Gramby v. Westinghouse Elec. Corp., supra* (*can* be applied to separate suit).

25. Fed.R.Civ.P. 24.

might be treated as representing an exceptional situation, justifying an application of the rule here even if it were ordinarily to be limited to intervention situations. I am, however, persuaded that, upon a balancing of the various considerations involved, a general extension of the rule to separate suit situations is preferable to one limiting the rule solely to cases in which former class members have intervened or attempted to intervene in the original suit. While it is undeniably true that in certain instances this will permit some fragmentation of the litigation against a defendant, that bare fact does not, in and of itself, appear to be a sufficient justification for refusing to apply the *American Pipe* tolling doctrine. After all, class members who simply "opt out" of the class will apparently have the benefit of the rule, at least if the footnote in *Eisen v. Carlisle & Jacquelin, supra,* is to be believed. And, of course, there is nothing which *requires* that multiple similar claims against a defendant be instituted jointly (by way of a class action or otherwise) to begin with.

■ Accordingly, whether the present case is viewed as one involving exceptional circumstances, or instead whether the *American Pipe* rule is simply taken as extending generally to separate suit situations, I conclude that the present plaintiffs are entitled to the benefit of the rule in tolling the statute of limitations on their 10(b) and 10b–5 claims. That tolling period will run from the date of commencement of the Alabama class action proceeding on May 2, 1977, to the date the decertification of their class became final on April 16, 1981.[26]

Having reached this point, I pause to note that, depending upon the facts ultimately developed, it may in the future become necessary to address the question whether, as between *American Pipe* and *McDonald,* the Supreme Court has fashioned a rule which *suspends* the running of the statute

of limitations, or instead *extends* it. The distinction lies in the fact that if *suspension* is involved the statute will commence to run again immediately upon finality of the order which denies or decertifies the class; while if *extension* is involved, in theory the plaintiff is simply granted an additional unit of time—most probably measured in terms of a "reasonable" period—in which to act after finality of the order which denies or decertifies the class. *American Pipe* itself clearly applied a suspension analysis, while *McDonald* could not have reached the result it did except through application of an extension theory. See generally Note, *Class Actions and Statutes of Limitations,* 48 U.Chicago L.Rev. 106 (1981). The Supreme Court has never expounded on the point, but the distinction could conceivably be of significance here because under a suspension theory the elapsed 32 days (48 days for plaintiff Greenlee, who was added as a party on June 4, 1981) between the date the order of the Alabama District Court became final and the date the present suit was filed must be counted against the two year limitations period, with the effect of establishing June 4, 1975 (or for Greenlee June 20, 1975), rather than May 2, 1975, as the pivotal date in connection with whether plaintiffs had or should have had knowledge of the fraud they assert. I do not feel it necessary to attempt an answer to the question at this point, however, since the proof before me is not sufficiently refined to make the distinction meaningful. I find, accordingly, that for present purposes plaintiffs' 10(b) and 10b–5 claims will be timely if, on or before either May 2, 1975, or June 4, 1975 (or June 20, 1975, as to Greenlee), plaintiffs neither knew of the fraud of which they now complain nor in the exercise of due diligence could have discovered it; and time-barred if otherwise.

■ Defendants urge that the facts presently before me demonstrate that plain-

---

**26.** The Supreme Court has granted certiorari in *Parker v. Crown Cork and Seal Co., supra,* and a petition for certiorari is pending in *Pavlak v. Church, supra* at note 17. The Court's decision in either or both of those cases will presumably be dispositive of the issue dealt with hereinabove; but rather than delay this opinion longer it was felt best to proceed, realizing obviously that the Court's ruling may require a reversal of my ruling herein.

tiffs in fact did know or could have known of the alleged fraud prior to those dates. On the present record, however, I must hold otherwise. Even if I disregard plaintiffs' allegations of fraudulent concealment as being insufficiently pleaded,[27] there is still no suggestion, much less proof, that plaintiffs had or should have had any awareness of fraud prior to default in the payment of the bond premiums—something that did not occur until June or July of 1975. Even if one assumes that each plaintiff should have been immediately alerted by that default, some reasonable period for inquiry must still be allowed them. The present record thus permits, at best, an argument that plaintiffs should have become aware of the fraud at some undefined point in time during the summer of 1975. Since the Bishop suit was filed on May 2, 1977, it is obvious that it cannot be said upon the facts presently available that plaintiffs' 10(b) and 10b–5 claims are necessarily time barred.

■ As a final point in this conclusion, defendants suggest that "a plaintiff has the burden of stating facts showing that the statute of limitations has not run when the complaint would otherwise show it has run," citing *Hellebrand v. Hoctor,* 331 F.2d 453 (8th Cir.1964), and *Duisen v. Terrel,* 332 F.Supp. 127 (W.D.Mo.1971), and argue that the present complaint fails to set forth such facts. The difficulty with the point is in the fact that plaintiffs have specifically pleaded the tolling effect of the Bishop suit, which of course moves the point of inquiry back to May 2, 1977, and in the fact that I do not read the complaint as showing upon its face that, absent special circumstances, the statute would have run by May 2, 1977. The complaint does not state when plaintiffs purchased their respective bonds, or

demonstrate when they discovered the fraud, and under what is said to be the preferred rule there is no requirement that it do so. *Resource Exploration & Min., Inc. v. Itel Corp.,* 492 F.Supp. 515, 516 (D.Colo. 1980); *Fuls v. Shastina Properties, Inc.,* 448 F.Supp. 983, 986–87 (N.D.Cal.1978); *Kerby v. Commodity Resources Incorporated,* 395 F.Supp. 786, 791 (D.Colo.1975); *Josef's of Palm Beach, Inc. v. Southern Investment Company,* 349 F.Supp. 1057, 1061 (S.D.Fla. 1972). Accordingly, there is nothing on the face of the complaint which demonstrates that the fraud was or should have been discovered more than two years prior to May 2, 1977. Indeed, as previously noted, not even the evidentiary materials submitted in connection with the present motion demonstrate that fact. In these circumstances the *Hellebrand* rule is simply inapplicable.

I believe it is apparent that a genuine factual issue, concerned with whether plaintiffs discovered or should have discovered the fraud of which they complain, prior to either May 2, 1975 or June 4, 1975, remains to be determined by the trier of fact. Summary judgment is of course inappropriate in those circumstances, and I conclude that defendants' present motion, as it relates to plaintiffs' 10(b) and 10b–5 claims, must accordingly be denied.

### B. State Law Claims

As to plaintiffs' claim under the Missouri Securities Act, Chapter 409, R.S.Mo.1969 (as amended), the relevant limitations period is, as previously noted, two years. Section 409.411(e), R.S.Mo.1969 (as amended). As also noted, however, that statute specifically provides that its two year limitations period begins to run at the time of the

---

**27.** The pleading of that subject is governed by Rule 9(b), Fed.R.Civ.P., which requires that in "all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity." *Gee v. CBS, Inc.,* 471 F.Supp. 600, 628 (E.D.Pa.1979), aff'd. 612 F.2d 572 (3rd Cir. 1979); *Campbell v. Upjohn Co.,* 498 F.Supp. 722, 726–30 (W.D.Mich.1980), aff'd. 676 F.2d 1122 (6th Cir.1982). I do not believe that standard is met by a simple averment that "defendants and those aiding them took steps or acts to conceal the alleged fraud and to lull plaintiffs and other bondholders into repose," although the subsequent averment that this was apparently accomplished by various of the defendants "writing to purchasers . . . in a manner which had the effect of lulling [them] into non-action and leading [them] to believe no fraud existed . . . or . . . that their interests were being protected," might be sufficient to create at least a marginal pleading of the point.

"contract of sale." [28] Since we deal here with a claim predicated directly upon a state statute, rather than with a federal cause of action which has simply borrowed the state limitations *period,* the language of the statute is of course controlling.

■ In this connection, although plaintiffs' complaint does not specifically allege when they purchased their respective bonds, it is abundantly clear from the complaint and associated materials that all such purchases occurred long before May 18, 1979 (two years prior to the date of filing of the instant suit). Further, it is also clear that neither section 516.230 (the Missouri "savings" statute, which grants an additional one year period within which to refile a claim which has earlier been non-prejudicially dismissed) nor section 516.190 (the Missouri "borrowing" statute) has any bearing here, since both those sections are ones which, under section 516.300, R.S.Mo.1969 (as amended), are rendered inapplicable with respect to a statutory cause of action which carries its own internal limitations provision, as Chapter 409 of course does. See *Buder v. Merrill Lynch, Pierce, Fenner and Smith,* 486 F.Supp. 56, 59 (E.D.Mo. 1980), *aff'd.* 644 F.2d 690 (8th Cir.1981). I conclude, accordingly, that plaintiffs' Chapter 409 claims, not having been filed within two years of the date of the contracts of sale for the bonds in question, must be considered time barred.

■ Beyond this, however, I cannot go, based on the record presently before me. Since plaintiffs' remaining state law claims—common law fraud and deceit, common law negligence, and "breach of trust" (although it is not entirely clear just what sort of claim plaintiffs are attempting to assert in this latter connection)—are, as such, ones to which Missouri's "borrowing" statute (§ 516.190) clearly could theoretically extend, it becomes critical to determine where such causes of action "originated" or "accrued," within the meaning of that statute. The information presently available to me does not permit any definitive assessment of that question. I do not know, for example, where plaintiffs (all are presently non-residents of Missouri) were residing when they purchased their bonds, where the bonds were originally issued, where or how they were sold to plaintiffs, where or how information concerning them was given to plaintiffs, or where the various alleged acts of negligence took place. Nor have the parties directed any of their briefing efforts to the exceedingly complex legal issues which may need to be addressed in this connection. In these circumstances, since summary judgment procedure places the burden upon the moving party—here defendants Rausch and Plaza Bank—to establish the non-existence of any genuine issue of material fact as well as the moving party's entitlement to judgment as a matter of law, I must deny defendants' motion, without prejudice, as it relates to the argument that the causes of action asserted in plaintiffs' Third, Fourth, Fifth, Sixth and Seventh Claims are time barred.

## IV

### FAILURE TO STATE A CLAIM

#### A. *10(b) and 10b–5 Claims*

Defendant Rausch has moved, pursuant to Rule 12(b), to dismiss plaintiffs' complaint as failing to state a claim against him upon which relief can be granted. In addressing this point, the analysis which is necessary may be facilitated by first outlining the requisite elements of plaintiffs' claims, followed by a statement of the applicable pleading rules. With that general outline in mind, the specific averments of

---

**28.** § 409.411(e) reads as follows:

"(e) No person may sue under this section more than two years after the contract of sale. No person may sue under this section (1) if the buyer received a written offer, before suit and at a time when he owned the security, to refund the consideration paid together with interest at six percent per year from the date of payment, less the amount of any income received on the security, and he failed to accept the offer within thirty days of its receipt, or (2) if the buyer received such an offer before suit and at a time when he did not own the security, unless he rejected the offer in writing within thirty days of its receipt."

the complaint may then be examined to determine their sufficiency.

With respect to a conventional 10b–5(b) claim, at least in the present sort of case, three general elements must be present: (a) a misrepresentation or omission of a material fact in connection with the purchase or sale of a security; (b) "scienter" in connection with that misrepresentation or omission; and (c), reliance by the plaintiff, in buying or selling the security, upon the misrepresentation or omission. *Savino v. E.F. Hutton & Co., Inc.,* 507 F.Supp. 1225, 1231 (S.D.N.Y.1981). In connection with these elements, a fact is deemed "material" if there is a substantial likelihood that a reasonable investor would consider it significant or important when making a decision to buy or sell. *Bell v. Cameron Meadows Land Co.,* 669 F.2d 1278, 1281 (9th Cir.1982); *Kidwell ex rel Penfold v. Meikle,* 597 F.2d 1273, 1293 (9th Cir. 1979); and *cf. TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); and *Affiliated Ute Citizens of Utah v. U.S.,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). As to "reliance," a plaintiff must not only rely upon the misrepresentation or omission in the subjective sense, but in the objective sense ("reasonable reliance") as well, *Huddleston v. Herman & MacLean,* 640 F.2d 534, 548, *mod.* 650 F.2d 815 (5th Cir.1981), *rev'd on other grounds* —— U.S. ——, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *City Na-*

*tional Bank of Ft. Smith, Ark. v. Vanderboom,* 422 F.2d 221, 230–31 (8th Cir.1970), although in cases where *non-disclosure*[29] is the primary feature, if materiality is shown there is a rebuttable presumption of reliance. *Affiliated Ute Citizens of Utah v. U.S., supra; Austin v. Loftsgaarden,* 675 F.2d 168, 176–78 (8th Cir.1982); *Continental Grain, Etc. v. Pacific Oilseeds, Inc.,* 592 F.2d 409, 412 n. 1 (8th Cir.1979); *Vervaecke v. Chiles, Heider & Co.,* 578 F.2d 713, 715–18 (8th Cir.1978). Finally, as to "scienter" it is clear that simple negligence in misstating or omitting to state a material fact, or in failing to investigate concerning it, will not suffice, while actual intent to deceive, manipulate or defraud obviously will. *Ernst & Ernst v. Hochfelder, supra; Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). What is less clear, since the Supreme Court has thrice declined to reach the point,[30] is whether "reckless" behavior (however defined) will suffice, although apparently every Circuit which has considered the question has responded affirmatively,[31] albeit with some differences in wording formulae.

In order for a defendant to be liable in a 10b–5(b) case, however, it is not necessary that he personally and directly perpetrate the fraud, at least if existing lower federal court decisions are to be followed. Under those decisions liability may also be imposed, under theories of so-called "secondary" liability,[32] upon persons who

---

**29.** As used in this opinion, the term "non-disclosure" refers to something analytically separate and distinct from an "omission." See text *infra* at pp. 45–8. My reading of the *Vervaecke* and *Austin* decisions, *infra,* convinces me that the Eighth Circuit views the distinction in precisely the same way.

**30.** *Herman & MacLean v. Huddleston, supra* at 682 n. 2; *Aaron v. SEC, supra* at 687 n. 5, 100 S.Ct. at 1950 n. 5; *Ernst & Ernst v. Hochfelder, supra* at 193 n. 12.

**31.** See *McLean v. Alexander,* 599 F.2d 1190, 1197 and n. 12 (3d Cir.1979) (collecting cases); and *cf. Stokes v. Lokken, infra.*

**32.** The distinction between the general categories of "primary" and "secondary" liability is perhaps best defined in Professor Ruder's now classic article, *Multiple Defendants in Securi-*

*ties Law Fraud Cases: Aiding and Abetting, Conspiracy In Pari Delicto, Indemnification, and Contribution,* 120 U.Pa.L.Rev. 597 (1972). According to Ruder, "primary" liability exists whenever a securities fraud defendant has violated a duty which he owes *directly* to the plaintiff. Ruder, *supra* at 612–20. "Secondary" liability, on the other hand, is liability which attaches to one who has not violated a duty which he owes *directly* to the plaintiff, but who is, instead, considered culpable because of his involvement with another who does have "primary" liability. Liability imposed upon a "controlling person" under § 15 of the 1933 Securities Act or § 20 of the 1934 Act, together with liability imposed under certain agency principles, upon aiders and abettors, and upon co-conspirators, are all examples of so-called "secondary" liability. Obviously, by this definition there can be no "secondary" liability in

aid and abet a securities violation, or who conspire to its commission. See generally Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution, supra* footnote 32. Although the Supreme Court has expressly reserved the issue of whether 10(b) and 10b–5 liability may be imposed on these theories, *Herman & McClean v. Huddleston,* —— U.S. ——, 103 S.Ct. 683, 686 n. 5, 74 L.Ed.2d 548 (1983); *Ernst & Ernst v. Hochfelder, supra* at 191–92 n. 7, and at least one commentator has suggested that the Court will ultimately rule the matter in the negative, Fischel, *Secondary Liability Under § 10(b) of the Securities Act of 1934,* 69 Cal.L.Rev. 80 (1981), an effort has been made to plead both such theories in the present case and both will be examined briefly here.

■ The lower federal court decisions mentioned above have by now rather clearly defined the elements of aiding and abetting liability in securities fraud cases. There are three prerequisites for such liability: (a) the existence of "primary" liability on the part of another person or persons, or at least proof of a "primary" violation by another person or persons; (b) the aider and abettor's "knowledge" of the "primary" violation; and (c) "substantial" assistance by the aider and abettor in the achievement or consummation of the "primary" violation. *Stokes v. Lokken,* 644 F.2d 779, 782–83 (8th Cir.1981); *ITT, an Intern. Inv. Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980); *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478, 483 n. 5 (2d Cir.1979), *cert. den.* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980). In this context, "knowledge" involves more than mere negligence in failing to learn ("should have known") the relevant facts respecting the "primary" violation. *Stokes v. Lokken, supra.* Whether "reckless" conduct in failing to learn of such facts is sufficient is, again,

a question the Supreme Court has yet to determine, although the Circuits have given a substantially unanimous affirmative response.[33] There is also said to be an aspect of interplay between all three of these elements—particularly the "knowledge" and "substantial assistance" requirements, *Stokes v. Lokken, supra* at 784, and at least some Circuits, including the Eighth, have held that the degree of "knowledge" and scienter required may be less (although presumably still above a mere negligence level) when the showing of "substantial assistance" is strong, while a greater showing of scienter may be required when there is a minimal showing on substantial assistance. *Stokes v. Lokken, supra.*

■ Conspiracy liability, as such, is a topic less often addressed in securities fraud cases than aider and abettor liability, presumably because of the difficulties of proof associated with it. Its two essential elements, however, have been found to be no different in this context than in any other sort of civil litigation: (a) an agreement to accomplish a wrongful act—here a securities law violation; and (b) an overt act in furtherance of the conspiracy. See generally, *Gilbert v. Bagley,* 492 F.Supp. 714, 727 (M.D.N.C.1980); *Troyer v. Karcagi,* 476 F.Supp. 1142, 1153 (S.D.N.Y.1979); Ruder, *Multiple Defendants In Securities Law Fraud Cases, Etc., supra* at 638–41. It is true that in the securities fraud area conspiracy liability will often bear a rather close affinity to aiding and abetting liability, since both require, as a predicate, a "primary" violation by another (which will, ordinarily, more than fulfill the need for any conspiratorial "overt act"), and since both would require scienter on the part of the defendant. There are, however, distinctions between the two theories. Thus the *causa qua non* of aiding and abetting is in the *act of rendering assistance,* while the critical element of a conspirator's liability,

the absence of "primary" liability or at least a "primary" actor. Ruder, *supra* at 628–30. A discussion of the types of situations in which a direct duty between a securities fraud plaintiff and defendant may be found, at least in con-

ventional 10b–5(b) terms, is set forth in the text, *infra* at pp. 1206–1208.

**33.** See footnote 31.

as such, is the act of *agreement*. *Ruder, Multiple Defendants In Securities Law Fraud Cases, Etc., supra*. Accordingly, although as a practical matter the facts which are sufficient to establish liability under one of these two theories will often be sufficient to establish liability under both, it is certainly theoretically possible to have one without the other, and an independent analysis should be made with respect to each.

■ Beyond all of this, and in addition to what might be termed the "conventional" theories of liability under 10b–5(b) discussed above, the past two years have witnessed the development of a separate theory of securities law liability which may have application in this case. That development represents a variation of what has come to be known as the "fraud on the market" theory of liability,[34] and is based upon subsections (a) and (c) of Rule 10b–5 rather than upon subsection (b). It was first articulated in *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (en banc), *cert. den.*, —— U.S. ——, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983), and provides for the imposition of liability when the defendants' fraudulent scheme results in a security being placed on the market when that security is in fact so thoroughly tainted with fraud and so lacking in

basic essentials that it would actually be, but for the fraud, unmarketable. According to this theory, a plaintiff who purchases such a security is relieved of pleading or proving reliance upon any defendant's specific representations or omissions, and instead is required to prove only his reliance on the "integrity of the market"—that is, simply that he relied upon the fact that the security was offered on the market. *Shores v. Sklar, supra* at 468–72; *Dekro v. Stern Bros. & Co.*, 540 F.Supp. 406, 410–11, 413 (W.D.Mo.1982); *Frankel v. Wyllie & Thornhill, Inc., supra*.

■ A careful study of *Shores, Dekro* and *Frankel* suggests that there are three general elements involved in this form of liability. The first and perhaps most critical element concerns the characteristics of the security itself. It must, obviously, be on the market [35]—that is, available for purchase by the public through some medium which does not require direct communication between the plaintiff and either the issuer or a prior holder. Additionally, it must in fact be "unmarketable"—a security which is so lacking in basic essentials that, in the absence of the fraudulent scheme or plan involved, it would never have been issued or marketed at any price; a security

---

**34.** As outlined recently in *Frankel v. Wyllie & Thornhill, Inc.*, 537 F.Supp. 730, 735–40 (W.D. Va.1982), this approach to securities liability may now be viewed as including three general categories of cases:

(1) Where there is a common scheme, of which defendant's misrepresentations and omissions were a part, to manipulate the value of stock, with a consequent artificial inflation of the market value of the stock and consequent subsequent injury to a plaintiff who purchased the stock at the artificially inflated price. Plaintiff need not prove that he relied upon defendant's acts or omissions —indeed, he would ordinarily be totally unaware of them—but only that defendant's acts or omissions were a material factor in artificially affecting the market value of the stock. The seminal case in this area is *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975).

(2) Where fraudulent misrepresentations or omissions in a proxy statement are utilized, as part of a scheme to manipulate stock prices, so as to create an unfair (to plaintiff) exchange ratio in a forced merger situation.

The case most often cited as an example is *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374 (2d Cir.1974). A forced-sale plaintiff need not plead or prove any reliance, since the sale is in fact forced rather than a matter of choice on his part. *Cf. Travis v. Anthes Imperial Ltd.*, 473 F.2d 515, 522–23 (8th Cir. 1973).

(3) Where the defendant's fraudulent scheme results in a security, which is actually entirely unmarketable, being placed on the market. It is, of course, this third category with which we are concerned here.

**35.** One commentator has suggested that there are several sorts of "markets," and that it may be necessary to distinguish between them. Note, *The Fraud-On-The-Market Theory*, 56 Harv.L.Rev. 113 (1982). Unfortunately, whatever merit that suggestion might have in connection with the ultimate resolution of a case upon a fully developed record, it is of little help in dealing with questions regarding the sufficiency of a complaint.

which, by its mere presence on the market, constitutes a fraud. There is a temptation to suggest that it must appear to the investing public to be "ordinary," or "genuine," but I judge that such a test proves more than is necessary; the essence of the liability here is that the very presence of the security on the market is itself an assurance to the public that it is "ordinary" or "genuine" in this sense.

The second necessary element will require that the security have reached the market as the result of a fraudulent scheme or plan designed to effect that end. Presumably this will often involve fraudulent misrepresentations or omissions, in connection with one or more of the various steps required to market and sell the security; but that is not necessarily so, as for example where the fraudulent scheme is alleged to include *all* those involved in the marketing and selling process; and in any event, it is not necessary that those matters actually be communicated to the plaintiff. It is said, instead, that the focus must be upon the ultimate effect or result of the scheme, rather than upon the mechanisms used to accomplish it. *Shores v. Sklar, supra.* In theory, then, individual items of misrepresentation or omission become important only insofar as they may demonstrate the contours of the scheme or plan, and the extent of a defendant's participation in it, and a traditional analysis of such items in terms of plaintiff's "reliance" thereon is unnecessary. The truly fundamental requirement in this connection would thus seem to be simply in a defendant's active participation in the scheme, accompanied by the necessary state of mind (scienter); *viz* active participation in causing the securities to be issued or marketed, knowing, or perhaps consciously and recklessly failing to discover, that those securities were so lacking in the basic essentials that they were not entitled to be marketed at all.

The third element, such as it may be, does involve the plaintiff's "reliance;" but as demonstrated in *Shores,* and articulated in *Frankel,* the "reliance" necessary here is not of the ordinary sort. It is, rather, simply plaintiff's reliance upon "the integrity of the market"—that is, his reliance upon the assumption that the securities would not be on the market unless they were entitled to be marketed. As expressed in *Shores, supra:*

> "Bishop could prove that he made a general request to his broker to purchase industrial development bonds, that his actual purchases covered a number of different issues, and that he did not undertake to determine which among the issues then offered were the most prudent investments or to second-guess the underwriters in the price and coupon rate they set. His pleadings would permit him to show that he was willing to accept any marketable risk. If a municipal authority was willing to authorize the issuance of the Bond, and the underwriters were willing to present the issue to the market, that was sufficient for Bishop's purposes. His pleadings allow him to show that he sought to make investments in securities which were entitled to be marketed."

And in fact, as may be seen in both *Shores* and *Frankel,* plaintiff himself need not even have made the decision to purchase the specific security. That decision may have been made by his broker, as in *Shores.* This may not mean that plaintiff relied any less, in a very general sense, upon the idea of "market integrity," but at this point the "reliance" concept becomes so attenuated that there may be good reason to ask whether it should even be retained in this context. Both *Shores* and *Frankel* have fixed it as an element, however, and for present purposes I will accept it as such.

The Eighth Circuit has yet to rule upon the variety of "fraud on the market" liability under consideration here,[36] although the

---

**36.** I must respectfully take issue with the dissenters' assertion in *Shores v. Sklar, supra* at 477, that the Eighth Circuit's ruling in *Vervaecke v. Chiles, Heider & Co., supra,* represents a rejection of this sort of "fraud-on-the-market" liability. The holding in *Vervaecke* was simply that an *Affiliated Ute* rebuttable presumption of reliance can be applied only in situations involving "primarily a failure to disclose" (a view perhaps mellowed by *Austin v.*

theory has been accepted in this District. See *Dekro v. Stern Bros. & Co., supra.* I am aware, too, that judges sometimes become unduly fascinated with new judicial playthings. Upon considerable reflection, however, I am convinced that the decisions in *Shores, Dekro* and *Frankel*·represent a correct, and valuable, step in the continuing evolution of securities law under section 10(b) and Rule 10b–5. The basic policy arguments for and against that form of evolution are well articulated as between the majority and dissenting opinions in *Shores;* and I can say only that I find the majority view the more persuasive.[37]

The pleading rules applicable to plaintiffs' claims of primary 10(b) and 10b–5 liability are simply stated, if not always easily applied. Since such claims are premised upon fraud, they are governed by Rule 9(b), Fed.R.Civ.P. *Benoay v. Decker,* 517 F.Supp. 490, 492 (E.D.Mich.1981); *Zaretsky v. E.F. Hutton & Co., Inc.,* 509 F.Supp. 68, 74 (S.D.N.Y.1981); *Fuchs v. Swanton Corp.,* 482 F.Supp. 83, 91 (S.D.N.Y. 1979). That rule requires, in contrast to normal federal "notice" pleading, that "[i]n all averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity." Rule 9(b) does not, however, render the "notice" pleading rules set forth in Rule 8 entirely inapplicable, and the obligation to plead the "circumstances" of the fraud "with particularity" should not be taken as requiring an allegation of detailed evidentiary matters. *Securities And Exchange Com'n. v. Tiffany Industries,* 535 F.Supp. 1160, 1166–67 (E.D.Mo.1982); *Brown v. Joiner Intern., Inc.,* 523 F.Supp. 333, 335–36 (S.D.Ga.1981); 2A *Moore's Federal Practice* ¶ 9.03 (1982). What seems to be required, rather, is simply a pleading which is specific enough to permit the defendant to identify the acts or omissions with which he is charged, the general basis for their claimed fraudulent character, and their effect upon the plaintiff—in short, a pleading which provides the defendant with fair notice of the fraud which is claimed against him, and which evidences a reasonable belief on plaintiff's part that his claim has merit. See *Gilbert v. Bagley, supra; Fulk v. Bagley,* 88 F.R.D. 153, 164–65 (N.D. N.C.1980). In achieving that end, it may sometimes be necessary to allege places, dates or at least time frames, or other identifying specifics; but I would eschew any mechanically applied rules in this connec-

---

*Loftsgaarden, supra* ). The court in *Vervaecke* was not concerned with "fraud-on-the-market" liability, and did not, as I read the opinion, in any way address that question. Nor is there anything inherently inconsistent between the result reached in *Vervaecke* and "fraud-on-the-market" liability, as the majority opinion in *Shores v. Sklar,* in dealing with the Fifth Circuit's counterpart holding in *Rifkin v. Crow,* 574 F.2d 256 (5th Cir.1978), points out. *Vervaecke* and *Rifkin* were decided against the backdrop of 10b–5(b) liability, and continue to be applicable there. "Fraud on the market" principles, on the other hand, derive from subsections (a) and (c) of 10b–5, and represent an entirely different theory of liability.

37. I would add, with respect to the dissenters' suggestion that the Supreme Court has evinced a "marked reluctance to extend the contours of private causes of action under the securities laws generally," *Shores v. Sklar, supra* at 484 n. 17, that at least as the Court itself has framed the matter, its concern has simply been with efforts to extend federal securities law liability beyond the language of the relevant statutes themselves. See, *e.g., Santa Fe Industries, Inc. v. Green, supra* at 472–79; and *cf.* Fischel, *Secondary Liability Under § 10(b) of*

the Securities Act of 1934, supra. It does not seem to me that "fraud on the market" liability, as dealt with herein, requires a "gloss to the operative language of the statute quite different from its commonly accepted meaning," *Ernst & Ernst v. Hochfelder, supra* at 199, in order to be considered, in the words of § 10(b), a "deceptive . . . contrivance" used or employed "in connection with the sale of a security. . . ." When a security which poses as being marketable is in fact so lacking in essential features that it has no business being on the market, and is brought to the market by means of a fraudulent scheme or plan designed to effect that end, it would seem difficult to suggest that a "deceptive . . . contrivance" in connection with the marketing (sale) of that security is not involved. Indeed, one of the commonly accepted meanings of the word "contrivance" is that of an "artifice, scheme or plan," while the word "contrive" means "to bring about by strategem." Webster's Third New International Dictionary 496 (1981). And, of course, "fraud on the market" liability would appear to fall squarely within the literal terms of subsections (a) and (c) of Rule 10b–5.

tion, since the circumstances of each case will obviously vary. And finally, in connection with all of the above, I note that Rule 9(b) specifically provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." In other words, there is no "particularity" requirement, as such, with respect to pleading the various states of mind which will be involved in a fraud claim (securities or otherwise). *Securities And Exchange Com'n. v. Tiffany Industries, supra.*

 Pleading aiding and abetting liability or a conspiracy is a slightly more troublesome subject. The difficulty lies in the fact that while both conspiracy and aiding and abetting would appear generally to be matters for "notice" pleading under Rule 8, see 2A *Moore's Federal Practice,* ¶ 8.17[5] (1982), a decisional rule has evolved which (at least with respect to conspiracies, but presumably extending to aiding and abetting as well) imposes specificity requirements somewhat akin to the "particularity" requirements of Rule 9(b). See generally 2A *Moore's Federal Practice, supra.* Thus it is often said with respect to conspiracy pleading that a mere conclusory allegation that a conspiracy has taken place will not suffice, *Ostrer v. Aronwald,* 567 F.2d 551, 553 (2d Cir.1977); *Granville v. Hunt,* 411 F.2d 9, 11 (5th Cir.1969); *Vazquez v. Ferre,* 404 F.Supp. 815, 821 (D.N.J.1975); *Nation v. United States Government,* 512 F.Supp. 121, 125 (S.D.Ohio 1981), and, variously, at least where possible, that enough facts should be alleged to support an inference of the necessary conspiratorial agreement, *Troyer v. Karcagi, supra,* to show overt acts which are reasonably related to promotion of the claimed conspiracy, *Nation v. United States Government, supra,* and to show the time frame and effect of the conspiracy, *Turley v. Hall's Motor Transit Company,* 296 F.Supp. 1183, 1187 (M.D.Pa. 1969). These rules have received their most pronounced development in civil rights litigation, but have by no means been limited thereto. See, *e.g., Matter of Johns-Manville Asbestosis Cases,* 511 F.Supp. 1235, 1240 (E.D.Ill.1981); *National Constructors v. National Electrical Contractors,* 498

F.Supp. 510, 528 (D.Md.1980). It is also said, however, that conspiracy pleadings should be liberally construed, because of the very nature of a conspiracy, *Vazquez v. Ferre, supra* at 822; and a reading of the cases convinces me that all that is truly required—much as with alleging fraud—is a pleading which is sufficiently specific to allow the defendant to identify the conspiracy of which he is alleged to be a part, particularly in terms of its nature and its effect upon the plaintiff. To the extent that acts of aiding and abetting are subject to this sort of added "specificity" requirement, the same test would presumably be applied; *viz,* that the pleading be specific enough to permit a defendant to identify the aiding or abetting with which he is charged. And finally, of course, in any case involving aiding and abetting liability, and in any conspiracy case where the defendant's alleged participation is not sufficient to subject him to independent "primary" liability, there must be other allegations which properly plead a "primary" violation by another or others.

 With these principles in mind I turn now to the questions raised by defendant Rausch concerning the sufficiency of the complaint. In addressing those questions, the usual rules for testing the sufficiency of a complaint will be applied: all well-pleaded averments will be taken as true, *Loge v. U.S.,* 662 F.2d 1268, 1270 (8th Cir.1981); *Barnes v. Dorsey,* 480 F.2d 1057, 1060 (8th Cir.1973); *Park View Heights Corp. v. City of Black Jack,* 467 F.2d 1208, 1212 n. 3 (8th Cir.1972); the complaint will be liberally construed in the light most favorable to the plaintiff, *Fusco v. Xerox Corp.,* 676 F.2d 332, 334 (8th Cir.1982); *Mandel v. Erickstad,* 648 F.2d 1175, 1177 (8th Cir.1981); all inferences which may reasonably be drawn from the facts alleged will be drawn in favor of the plaintiff; *Park View Heights Corp. v. City of Black Jack, supra;* all doubts will be resolved in favor of the sufficiency of the complaint, *Mandel v. Erickstad, supra;* and the complaint will not be dismissed unless it appears beyond doubt that the plaintiff can

prove no set of facts thereunder which would entitle him to relief. *Price v. Moody,* 677 F.2d 676, 677 (8th Cir.1982).

Rausch attacks the sufficiency of the complaint in two specific respects. First, he suggests that the averments regarding him deal solely with "omissions," and that there is nothing in the complaint which shows the existence of any "duty" on his part to disclose such omitted matters. Second, he urges that the complaint is deficient in connection with any allegations of plaintiffs' "reliance" upon his alleged omissions, or indeed upon the misrepresentations or omissions of anyone else. I will take these points in reverse order, since to do so may aid the final analysis.

As to "reliance" in conventional 10b–5(b) terms, I note that paragraph 7. of the complaint avers that Rausch "knowingly drafted or wrote opinions favoring the legality of the Series A 1973 bonds. . . ." Paragraph 20, taken out of order for present purposes, alleges, inter alia, that in those legal opinions Rausch omitted to state a number of allegedly material matters, the absence of which rendered the opinions misleading. Paragraph 7., in continuing, alleges that:

> "defendant Rausch intended or knew that such approving legal opinion, as it was printed on the face of said bonds, would be relied upon by the plaintiffs and other purchasers of said bonds and would lead plaintiffs and other purchasers to believe that they had purchased a safe and secure investment. . . ."

The potential problem here is perhaps apparent: it is quite unclear from the quoted language whether plaintiffs' allegation is that Rausch's opinion was relied upon by them *in their decision to purchase the bonds,* or instead that Rausch's opinion, as printed on the face of the bonds, simply functioned to reassure them, *after the bonds had been purchased,* with respect to the bonds' validity. If the latter, of course, there is no actionable "reliance," if that is to be required, since the opinion would bear no causal relationship to plaintiffs' decision to buy. See *Mendelsohn v. Capital Under-writers, Inc.,* 490 F.Supp. 1069, 1086, 1088 (N.D.Cal.1979); *Morgan v. Prudential Funds, Inc.,* 446 F.Supp. 628, 632–33 (S.D.N.Y.1979). I conclude, however, that for present purposes this point must be ruled in plaintiffs' favor. As previously noted, in dealing with any ambiguities in the complaint I must resolve them in plaintiffs' behalf. One construction of the language quoted above is that plaintiffs relied upon the opinion in *both* respects mentioned. I will grant that the total "flavor" of the passage might suggest otherwise, and that ordinary bond issuing and marketing practices might make it somewhat unlikely that all these plaintiffs were reviewing bond counsel's opinion (whether on the face of the bond or otherwise) prior to a decision to purchase. The question is perhaps close, but since a construction favoring the validity of this aspect of the complaint can be indulged within reason, and since it is certainly not impossible that plaintiffs reviewed and relied upon bond counsel's opinion in making their decision to purchase, I will accept those averments as alleging such reliance. In these circumstances it is unnecessary—again, at least for present purposes—that I determine whether, under the Eighth Circuit's holdings in *Vervaecke v. Chiles, Heider & Co., supra,* and *Austin v. Loftsgaarden, supra,* the claim against Rausch is primarily one of nondisclosure, or instead primarily one of misstatements or omissions, and hence whether an *Affiliated Ute* presumption of reliance, or some variation thereof, may apply.

Further, and of perhaps more importance in the final analysis, given the rather tenuous nature of any apparent conventional "reliance" by these plaintiffs, is my conclusion that the complaint is sufficient in pleading "fraud on the market" liability. As a short reference to the paraphrased allegations of the complaint set forth in Section I of this opinion may indicate, the present case would indeed seem generally to fall squarely within the perimeters of that theory as developed in *Shores, Dekro* and *Frankel.* Whether plaintiffs can prove those allegations, of course, may be

quite another matter. But I must accept their assertions as true for present purposes, and in doing so I am confronted with a situation in which the bonds in question—in being unsecured or virtually unsecured, in being issued without any appropriate closing procedure, and in being premised upon a project which was known to be likely if not virtually certain to fail—would indeed appear to have been so lacking in basic essentials that, absent a fraudulent scheme or plan, they would never have been issued or marketed. As a matter of fact, the matters outlined in the complaint are identical in many respects to the situation described in *Shores v. Sklar, supra.* And Rausch's alleged actions as bond counsel, in issuing a misleading bond opinion (with the requisite scienter, which is alleged), would clearly mark him as a substantial actor and integral participant in the scheme or plan, since a bond opinion was a necessary step in issuing and marketing the bonds. See *Shores v. Sklar, supra* (attorney acting as bond counsel); and *Frankel v. Wyllie & Thornhill, Inc., supra* (appraisers involved in rendering appraisals on property securing bonds, which was a critical step in the issuing process). Accordingly, since the complaint also shows by fair inference if not by express articulation that plaintiffs "relied upon the market" in purchasing the securities in question, I hold that a claim under subsections (a) and (c) of Rule 10b–5 has in general been adequately stated, and that further averments of "reliance," either generally or as to Rausch specifically, are unnecessary with respect thereto.

As mentioned, Rausch also suggests that the averments respecting him deal solely with "omissions," and that there is nothing in the complaint which shows that he had any "duty" to disclose such omitted matters. In support, Rausch cites *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), and argues that he had no pre-existing "relationship of trust and confidence" with the plaintiffs.

It is true that there can be no liability for a true failure to disclose in the absence of a duty to make disclosure. This would be so even if the question arises in connection with some aspect of a "fraud on the market" claim under subsections (a) and (c) of 10b–5. I do not, however, read the present complaint as premised upon a true "non-disclosure" situation, either in connection with 10b–5(b) liability on Rausch's part or in connection with a "fraud on the market" theory of liability as regards any defendant. Nor do I view *Chiarella's* use of the phrase "duty to disclose arising from a relationship of trust and confidence between the parties," 445 U.S. at 230, 100 S.Ct. at 1115, as representing or suggesting the sole way in which a direct "duty" between a defendant and a plaintiff may arise in securities fraud situations.

As concerns traditional liability under 10b–5, there are in reality several ways in which a "duty" owed directly by a defendant to a plaintiff may come into being. The first, and most basic, of those situations exists whenever a defendant undertakes the affirmative act of communicating or disseminating information (which in this context refers to any form of communication or dissemination), with an intent, knowledge or awareness that the information will be communicated or disseminated to persons such as the plaintiff, and will or may be utilized by them in connection with the purchase or sale of a security.[38] There is in

---

**38.** Even with an affirmative act in communicating or disseminating information, there will still be no "duty" unless there is an intent, knowledge or awareness on the defendant's part that the statements being made, or previously made, will be or have been communicated to and may be, or may have been, relied upon by the securities purchaser or seller. In many instances, of course, this presents no problem, as where the defendant communicates face to face or otherwise directly with the plaintiff.

As one departs from face to face or direct communications situations, however, problems may arise; and it is clear that where there was no reason for the defendant to know or believe that his statements would be communicated to *or* relied upon by the securities purchaser or seller, he has no "duty" to that person. See, *e.g., Securities & Exch. Com'n. v. Washington County, Etc., supra; ITT, an Intern. Inv. Trust v. Cornfeld, supra; In re North American Acceptance Corp. Securities Cases, supra; Men-*

such instances obviously a general obligation, or "duty," to speak truthfully; or, alternatively stated, a "duty" not to communicate something which is known to be untrue (or, perhaps, in which the defendant has so little basis for honest belief that the requisite degree of "recklessness" is involved). *First Virginia Bankshares v. Benson,* 559 F.2d 1307, 1317 (5th Cir.1977). And encompassed within that general obligation is also an obligation or "duty" to communicate any additional or qualifying information, then known, the absence of which would render misleading that which was communicated. *First Virginia Bankshares v. Benson, supra.* While this latter "duty" might loosely be described as a "duty to disclose," I would prefer, for purposes of distinguishing it from a true "duty to disclose," situation, dealt with below, to label it as a "duty not to omit." In reality, it is simply one facet of the general obligation to speak truthfully, arising out of and because of an affirmative act by the defendant in communicating. There is, of course, nothing new or startling in this concept; it is expressed in the literal terms of Rule 10b–5(b) itself, and has long been an integral part of the law of common law fraud and deceit. See Restatement (Second) of Torts § 529 (1977); Prosser, *Law of Torts* § 106 (4th Ed. 1971).

At the opposite end of the spectrum, as I would rationalize the cases, is a different sort of "duty," which arises in true "nondisclosure" situations. In these instances there has been no affirmative act of communication by the defendant to the plaintiff which triggers an obligation on the defendant's part. The defendant's "duty" here, instead, is a matter which arises solely by virtue of some pre-existing special relationship with the plaintiff; and is what in some respects might be more accurately referred to as a "duty to come forward." It was this sort of "duty" with which the Supreme Court was concerned in *Chiarella.* As the Court held there, it exists only when there is "a relationship of trust and confidence between the parties." An example may be seen in *Bartels v. Algonquin Properties, Ltd.,* 471 F.Supp. 1132, 1147 (D.Vt. 1979) (general partners' relationship to limited partners).

Midway between these two extremes may be seen yet a third situation in which a "duty" on the part of the defendant can arise. Involved here are instances where the defendant, in good faith, has communicated or disseminated information which *later* becomes known to him to have been false or misleading when made. In these situations, where the newly discovered information has a direct bearing upon the information previously given, the defendant has a "duty" to communicate the new information. See, *e.g., ITT, an Intern. Inv. Trust v. Cornfeld, supra* at 927; *First Virginia Bankshares v. Benson, supra; United States v. Natelli,* 527 F.2d 311, 319 (2d Cir.1975); *In re North Am. Acceptance Corp. Securities Cases,* 513 F.Supp. 608, 636 (N.D.Ga.1981). As may be seen, this particular variety of "duty" combines certain features of both those outlined above. Analytically, it may be said to arise not because of

---

*delsohn v. Capitol Underwriters, Inc., supra; In re GAP Stores Securities Litigation,* 457 F.Supp. 1135, 1141–42 (N.D.Cal.1978); *Sharp v. Coopers & Lybrand,* 457 F.Supp. 879, 886–87 (E.D.Pa.1978), *aff'd.* 649 F.2d 175 (3d Cir.1981).

The courts have taken various approaches in their articulation of this factor. Some have spoken in terms of "foreseeability," stating that a defendant can be liable only if he knew or "reasonably could foresee" the communication of his statements to purchasers or sellers of the security. See *Sharp v. Coopers & Lybrand, supra.* The Sixth Circuit has spoken in terms of "direct contact" between the defendant and the purchaser or seller, but has made clear that this does not require face to face dealings or

even direct communication. See *Securities & Exch. Com'n. v. Washington County, Etc., supra.* Actually, given the many-faceted scienter requirements of *Ernst & Ernst v. Hochfelder, supra,* it would seem that the question might best be analyzed simply in terms of the defendant's knowledge or intent: *viz,* an actual intent, knowledge or awareness on the defendant's part that his information will be communicated to persons such as plaintiff, and will or may be utilized by them in connection with the purchase or sale of a security; or perhaps, additionally, a conscious and reckless disregard of the fact that the information may be so communicated and used.

any independent, personalized relationship of trust and confidence between the defendant and the plaintiff, but rather because of the defendant's prior affirmative act of communication. On the other hand, performance of the duty requires a further affirmative act of the defendant, in correcting the information previously conveyed, and the duty itself actually arises, and can be breached, only at such later time following the original communication as the defendant learns of the newly discovered information. For convenience sake, I would denominate this sort of "duty" as a "duty to correct."

■ Viewed against this backdrop, and given the liberal interpretation accorded paragraph 7. of the complaint, it is clear that plaintiffs' allegations are sufficient, in connection with any 10b–5(b) claim against Rausch, to show the existence of a "duty" on his part running directly to plaintiffs. Again, paragraph 7. alleges that Rausch drafted a legal opinion "favoring the legality" of the bonds (which by virtue of various omitted matters was misleading), "knowingly" delivered the opinion to the bond printer "so that said opinion would be disseminated or delivered" to plaintiffs, and "intended or knew that such opinion would be relied upon by plaintiffs...." In terms of showing a duty to state the omitted matters—a duty arising out of Rausch's affirmative act in communicating the information contained in the bond opinion—nothing more is required. Since this is *not* a true non-disclosure situation, a separate, pre-existing relationship of "trust and confidence" is *not* required.

I also find plaintiff's complaint sufficient in this respect as concerns "fraud on the market" liability, although—as with questions of "reliance"—questions regarding a defendant's "duty" cannot always be dealt with in a conventional fashion in this context. Even here, in a true non-disclosure situation I would think it still true that there can be no "duty to disclose" absent that pre-existing relationship of "trust and

confidence" between the defendant and the plaintiff which is required by *Chiarella.* But where a defendant's participation in the fraudulent scheme is in the communication or dissemination of false or misleading information (whether by actual untruths or by omissions, and whether known to be false or misleading when made, or subsequently discovered to be so), it obviously becomes impossible to measure his "duty" by reference to his expectation that the information will be communicated to and relied upon by the plaintiff, since "fraud on the market" liability does not rest upon, or even contemplate, the communication of anything by him to the plaintiff. In these circumstances, if one is to be concerned with concepts of "duty" at all, the only alternative is to predicate the inquiry upon a requirement that the defendant's communication or dissemination of information be accompanied by an intent, knowledge or awareness that it will be imparted to and relied upon by some person who is substantially involved in the issuing and marketing of the securities. In any event, regardless whether "duty" is to be dealt with and analyzed in this manner, or instead whether the subject is simply treated as a part of a general scienter requirement, it is clear that plaintiffs' complaint here is sufficient in pleading both Rausch's affirmative participation, and scienter, in connection with the scheme alleged.

In connection with what appears to be the principal allegation against Rausch, and any liability therefor arising under subsection (b) of Rule 10b–5, it is unnecessary to be concerned with concepts of "aiding and abetting." That principal allegation relates to the issuance of the bond opinion, upon which plaintiffs allegedly relied in their decisions to purchase the bonds—a situation which, under the Ruder analysis I have followed, would cast Rausch as a "primary" violator in any event. There are, however, two additional specific averments concerning Rausch which could, under the conventional sort of analysis applied to 10b–5(b) claims, conceivably give rise to aiding and

abetting liability.[39] The first of these is found in paragraph 24.(c), in the averment that Rausch "gave material assistance to defendant Miller which enabled the latter to obtain and unlawfully divert" monies from the bond proceeds to his own use. The second is found in paragraph 24.(d), in the allegation that Rausch (and others) "helped negotiate transactions leading up to the issuance and/or distribution of the Bonds...." I conclude that, within the framework of this complaint as presently drawn, neither is sufficient as a pleading of aiding and abetting liability in the context of a 10b–5(b) claim.

The difficulty with both averments is that neither identifies a "primary" 10b–5(b) violation to which "secondary" liability could attach. As discussed previously, in order for a "primary" violation to exist there must be, among other things, an act or failure to act by which someone breaches a "duty" owed directly to the plaintiff. That "duty" will ordinarily arise in one of the three ways previously mentioned, two of which require the communication of information (however indirectly) from the primary violator to the plaintiff, while the third requires the existence of a special relationship of "trust and confidence" between the plaintiff and the primary violator. As to the allegation concerning defendant Miller's diversion of bond proceeds, even if I indulge in the assumption that the same occurred *prior* to plaintiffs' purchase of their bonds[40] there is still nothing in the complaint to suggest that this was in any way related to any information ever communicated to the plaintiffs in connection with their bond purchases.[41] The same must also be said, I think, with respect to helping "negotiate transactions leading up to" the bond issue: there is simply nothing in the complaint to suggest that these "transactions"—whatever they might have been—were the subject of or productive of any information which was ever communicated to plaintiffs in connection with their bond purchases. Nor does the complaint allege or show a relationship of "trust and confidence" existing between any of the plaintiffs and any of the defendants, upon which a duty to disclose in connection with these matters might be predicated. Accordingly, whatever the extent of Rausch's aid and assistance in connection with those matters might have been, the matters themselves do not reflect a "primary" 10b–5(b) violation by anyone.

Much the same can be said with respect to any theory of 10b–5(b) "secondary" liability based upon a conspiracy. Taken as a whole, the complaint may be sufficient to suggest the general existence of a conspiracy amongst some or all of the defendants, even though it is nowhere identified by name, and even though there is no explicit allegation of an "agreement," as such. See, e.g., *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 444–47 (3d Cir.1977). Even if a conspiracy *is* taken to be alleged, however, the only object which could be ascribed to it, from the averments of the complaint, would be the ultimate act of issuing and marketing the bonds; and it becomes most difficult to ascertain the existence of any "primary" violation, in conventional 10b–5(b) terms, in that generalized occurrence.[42]

**39.** There is, in paragraph 24.(d), a third averment concerning Rausch, which alleges that he "otherwise knowingly encouraged, aided and abetted the sale of said Bonds...." Under the authorities previously cited, I consider this too non-specific to constitute a proper pleading of any separate aiding and abetting liability.

**40.** If that assumption is not indulged, 10b–5 liability could not exist as to this item in any event, since the acts in question, in occurring *after* plaintiffs' bond purchases, would bear no causal relationship to the purchase of those bonds. See *Mendelsohn v. Capital Underwrit-*

*ers, Inc., supra; Morgan v. Prudential Funds, Inc., supra.*

**41.** Without that necessary predicate for 10b–5(b) liability, the act of diverting bond proceeds, even if occurring *prior* to plaintiffs' bond purchases, would appear to represent nothing more than corporate or fund mismanagement, which, however egregious, is a subject that cannot be reached through § 10(b) and Rule 10b–5. *Santa Fe Industries, Inc. v. Green, supra.*

**42.** It might be possible to construe plaintiffs' averments as alleging that the bond instru-

In respect of the "fraud on the market" liability under 10b–5(a) and (c) which I find to be pleaded, I believe any analysis based upon distinctions between "primary" and "secondary" liability, and accordingly any analysis focused upon "aiding and abetting" and "conspiracy" as predicates for liability, is unnecessary and in fact conceptually inappropriate. Whatever their viability may be in a 10b–5(b) context, such theories simply will not fit, analytically, the concepts involved in "fraud on the market" liability. As noted, they depend in the first instance upon the identification of a "primary" violator. The search for a "primary" violator will in turn necessitate an analysis of "duty," and for the reasons previously mentioned traditional concepts of "duty" will often be inapplicable in a "fraud on the market" situation. In these circumstances, there is nothing to be gained and perhaps much to be lost by attempting to assess "fraud on the market" liability in terms of "primary" violations and of "aiding and abetting" or conspiracy in connection therewith. It would be sufficient in this respect, I believe, simply to find a general liability on the part of each person who, by way of affirmative acts, committed with the requisite degree of scienter, renders substantial assistance to the scheme. As indicated previously, I find the complaint sufficient in this respect as concerns Rausch.

Rausch makes no attack upon the sufficiency of the complaint in connection with its allegations of scienter, or in connection with the materiality of the various matters alleged to have affected the marketability of the bond issue, and as noted I find that the complaint is in fact fully sufficient in those respects. I conclude, accordingly, that each element of both a 10b–5(b) claim and a 10b–5(a) and (c) claim has been properly pleaded concerning Rausch, and that his motion to dismiss the complaint as fail-

ments themselves represented a communication of whatever information was contained thereon, upon which plaintiffs relied in deciding to purchase the bonds. The complaint is even less clear in this respect, however, than in connection with Rausch's bond opinion—a subject which was resolved favorably to plaintiffs only by a very liberal construction of the complaint.

ing to state a claim against him in that connection must be denied.

## B. State Law Claims

Plaintiffs' state law claims which yet remain are found in their Third Claim, for common law fraud and deceit, their Fourth Claim, for common law negligence, their Fifth and Sixth Claims, for punitive damages, respectively, under their Third and Fourth Claims, and their Seventh Claim, for "Breach of Trust and Constructive Trust and Accounting." The brief filed on behalf of defendant Rausch does not suggest wherein or how these claims are insufficiently pleaded, and I find in fact that they are sufficient for these purposes, at least as to the Third, Fourth, Fifth and Sixth Claims. The Seventh Claim, composed as it is of a rather confusing amalgam of factual averments, conclusory allegations and purely argumentative assertions, without a clear articulation at any point of the precise legal theory which is being pursued, troubles me; but it appears to be directed against defendant Plaza Bank alone, which has not attacked its sufficiency; and in those circumstances I decline to address its sufficiency.

## IV

## VENUE AND PERSONAL JURISDICTION

In his final point defendant Rausch argues that venue with respect to plaintiffs' 10(b) and 10b–5 claims does not exist in this District, and that the Court lacks personal jurisdiction over him with respect to plaintiffs' state law claims. Plaintiffs counter with the assertion that venue here is appropriate under the so-called "co-conspirator" theory of venue, and that pendent jurisdiction exists with respect to the state law claims.

I do not find it productive to pause long over the matter in any event, however, since when taken with the other averments of the complaint this subject in fact will be seen to represent the central feature of "fraud on the market" liability, and may be dealt with more profitably in that context.

Any analysis of the appropriate venue concerning 10(b) and 10b–5 claims must begin with section 27 of the 1934 Securities Exchange Act, 15 U.S.C. § 78aa. In pertinent part, that section provides:

"The district courts of the United States, and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this chapter or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

Working from this language the courts have formulated what has come to be known, somewhat loosely and inaccurately, as the "co-conspirator" theory of venue. Although not yet a subject dealt with by the Eighth Circuit, it has, apparently without exception, been recognized and approved by each court elsewhere which has been confronted with the problem to which it relates. For the more recent cases, see *Hilgeman v. National Ins. Co. of America,* 547 F.2d 298, 301–02 (5th Cir.1977); *Mariash v. Morrill,* 496 F.2d 1138, 1143–45 (2d Cir.1974); *Bath Industries v. Blot,* 427 F.2d 97, 114 (7th Cir.1970); *Hill v. Turner,* 492 F.Supp. 61, 63–4 (M.D.Pa.1980); *Securities & Exch. Com'n. v. Diversified Indus.,* 465 F.Supp. 104, 111 (D.D.C.1979); *Warren v. Bokum Resources Corp.,* 433 F.Supp. 1360, 1363–64 (D.N.M.1977); *Bertozzi v. King Louie Intern., Inc.,* 420 F.Supp. 1166, 1169–71 (D.R.I.1976); *Klepper Krop, Inc. v. Han-*

*ford,* 411 F.Supp. 276, 280–81 (D.Neb.1976); *Keene Corporation v. Weber,* 394 F.Supp. 787, 790–92 (S.D.N.Y.1975); *Arpet, Ltd. v. Homans,* 390 F.Supp. 908, 910–12 (W.D.Pa. 1975); *Burkhart v. Allson Realty Trust,* 363 F.Supp. 1286, 1292–93 (N.D.Ill.1973); and *Securities & Exch. Com'n. v. National Student Mkg. Corp.,* 360 F.Supp. 284, 292 (D.D. C.1973). Its essence was succinctly stated in *Warren v. Bokum Resources Corp., supra,* in the following language:

"It is clear...that for purposes of venue for claims brought under the Act, it is not necessary that each defendant named have engaged in acts or transactions in the forum district. 'Venue under the Exchange Act is proper if one act in furtherance of the unlawful scheme is done in the forum district. This does not require that each defendant perform such an act; sufficient is an act of which all the defendants were the intended beneficiaries and a part of the fraudulent scheme.'"

The result, if such an act has occurred in the forum district, is to subject *all* defendants to suit there. As explained in *Securities & Exch. Com'n. v. National Student Mkg. Corp., supra:*

"It is well recognized that in multi-defendant and multi-forum securities fraud actions any act committed material to and in furtherance of an alleged fraudulent scheme will satisfy the venue requirement of the Exchange Act as to all defendants wherever the defendants are found. Proper venue as to White & Case and Epley is not dependent upon their commission of a violation within this jurisdiction for as Judge Wyatt observed in *Clapp v. Stearns & Co.,* 229 F.Supp. 305, 307 (S.D.N.Y.1964) '[i]t is enough "if any act or transaction" by any defendant occurred here....'"

In applying this rule the courts have made clear that an act in the forum district, in furtherance of the fraudulent scheme, is vital; it is not sufficient, for purposes of venue in connection with *all* defendants, that venue may otherwise exist as to one or more defendants simply because they reside in the forum district, or

are found there, or do business there. *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326, 1343 (2d Cir.1972); *Keene Corporation v. Weber,* 394 F.Supp. 787, 790 (S.D.N.Y.1975); *Schreiber v. W.E. Hutton & Co.,* 382 F.Supp. 297, 298–99 (D.D.C.1974). There need be no more than a single act in the forum district, however, *Securities & Exch. Com'n. v. Diversified Indus., supra; Warren v. Bokum Resources Corp., supra,* and that act does not need to form "the core of the claim;" all that is necessary is that it be "something more than an immaterial part of the claim." *Warren v. Bokum Resources Corp., supra; Bertozzi v. King Louie Intern., Inc., supra; Burkhart v. Allson Realty Trust, supra.* In that regard, the sole act of mailing a premium notice into the forum district has been held sufficient, *Hilgeman v. Nat'l. Ins. Co. of America, supra,* as have been sole acts in mailing a release letter from the forum district, *Mariash v. Merrill, supra,* mailing a tender offer into the forum district, *Warren v. Bokum Resources Corp., supra; Bertozzi v. King Louie Intern., Inc., supra,* and even making a telephone call in the forum district, *Clapp v. Stearns & Co.,* 229 F.Supp. 305, 307 (S.D.N.Y.1964). And I note, as a final matter, that an actual conspiracy between the various defendants, as such, is not necessary; an aiding and abetting relationship and an act of aiding and abetting in the forum district will suffice, *Hill v. Turner, supra,* as would presumably any other sufficient act in furtherance of a fraudulent scheme, regardless of the technical relationship between the participants in that fraudulent scheme.

▪ As previously indicated, I have found that plaintiffs' complaint is sufficient in pleading a "fraud on the market" theory of liability under 10b–5(a) and (c); and there are several acts shown to have occurred in this District which must be viewed as significant in connection with that form of liability. The deposition testimony of Robert Coatsworth, which stands unrebutted, establishes that the initial communication between defendants Riley and Plaza Bank, with regard to the Bank acting as trustee for the bond issue, occurred in Kansas City, Missouri; that various letters leading up to Plaza Bank's agreement to act as trustee were sent from or received in Kansas City, Missouri; that the original version of the trust indenture for the bond issue was delivered to Plaza Bank in Kansas City, Missouri; that the revised version of that trust indenture was delivered to Plaza Bank in Kansas City, Missouri; that a copy of Rausch's bond opinion, either as a separate document or as printed on the face of a sample bond, was delivered to Plaza Bank in Kansas City, Missouri, and relied upon by the Bank in its decision to act as trustee; and that Plaza Bank executed the trust indenture in Kansas City, Missouri. These acts go to the very heart of a "fraud on the market" theory, since the presence of a trustee was integral to the functioning of the bond issue, or at least to its appearance of functioning. That Rausch himself did not perform those acts, or even know they were occurring, is immaterial for *these* purposes (although, obviously, his ultimate liability might certainly be affected by those circumstances). In this situation, under the authorities cited above, I feel it clear that the venue for all of plaintiffs' 10(b) and 10b–5 claims is properly laid in this Court.

▪ As concerns plaintiffs' remaining state law claims, it is apparent from the complaint that, with one potential exception, all arise, together with plaintiffs' 10(b) and 10b–5 claims, from "a common nucleus of operative facts." The basis for pendent jurisdiction over those claims thus exists; and considerations of judicial economy and the conservation of judicial resources convince me that my discretion should be exercised to allow such jurisdiction here. See *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The potential exception is plaintiffs' Seventh Claim, which suggests an involvement of matters post-dating and factually unrelated to plaintiffs' acquisition of their bonds and any fraud connected therewith. As previously noted, however, that claim is one which appears to be directed solely against defendant Plaza Bank; and since the Bank has mounted no attack upon this Court's

jurisdiction over it in connection with that claim, the matter does not seem to be one which requires resolution at this point.

■ It is unclear whether Rausch's argument with respect to the reach of the Missouri "long arm" statute, section 506.-500, R.S.Mo. 1969 (as amended), was designed to address the problem of personal jurisdiction which might exist in connection with the state law claims if plaintiffs' 10(b) and 10b–5 claims were dismissed, or instead is premised upon the idea that pendent jurisdiction over non-residents can be maintained only through Rule 4(e), Fed.R.Civ.P. (which permits a federal court to utilize the "long arm" statutes and rules of the state in which it sits, in exercising personal jurisdiction over those who are not inhabitants of or found in that state). As to the first possibility, I have of course now ruled that a 10(b) and 10b–5 claim is properly asserted, and properly filed in this Court, and that plaintiffs' state law claims against Rausch are entitled to be maintained as pendent claims.[43] As to the latter possibility, while there appears to have been some conflict of authority on the point at one time, see *Bertozzi v. King Louie Intern., Inc., supra* at 1171–72, and cases cited therein at n. 1, the more recent and presently prevailing view is that extraterritorial personal jurisdiction acquired through section 27 of the 1934 Securities Exchange Act in connection with federal securities law claims is not limited to those federal claims, but suffices for pendent non-federal claims as well. *Robinson v. Penn Central Co.,* 484 F.2d 553, 555 (3d Cir.1973); *Warren v. Bokum Resources Corp., supra* at 1364–65; *Bertozzi v. King Louie Intern., Inc., supra; and cf. Travis v. Anthes Imperial Ltd., supra* at 528–29. As to plaintiffs' pendent claims, accordingly, there is no need to be concerned with the extent to which *in personam* jurisdiction might have been effected through use of the Missouri "long arm" statute.

**ORDERS**

Pursuant to the foregoing, it is hereby ORDERED:

1. The claims asserted by plaintiffs Allgood, McFeely and Kessler under section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 of the Securities Exchange Commission, are hereby dismissed as to all defendants; said plaintiffs being granted leave to file, within thirty (30) days from the date hereof, an amended complaint which properly pleads said plaintiffs' standing to assert survived 10(b) and 10b–5 claims of the original purchasers of the bonds in question;

2. Plaintiffs Allgood, McFeely and Kessler shall show cause, within thirty (30) days of the date hereof, why their state law claims as against all defendants should not be dismissed; or in the alternative, within that time period, may file an amended complaint which properly pleads said plaintiffs' standing to assert survived state law claims of the original purchasers of the bonds in question;

3. The summary judgment motions of defendants Rausch and Plaza Bank to dismiss plaintiffs' claims as time barred are hereby denied, except with respect to plaintiffs' Second Claim, as to which said motions are hereby granted. Plaintiffs' Second Claim is hereby dismissed;

4. Defendant Rausch's motion to dismiss plaintiffs' complaint as failing to state a claim against him upon which relief can be granted is hereby denied; and

5. Defendant Rausch's summary judgment motions with respect to improper venue, and lack of personal jurisdiction over him, are hereby denied.

---

**43.** I note again that the Seventh Claim, which in fact may not be a proper pendent claim, is not directed against Rausch but instead is directed against Plaza Bank.